Filed 6/26/15; pub. order 7/2/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VALLEY CREST LANDSCAPE DEVELOPMENT, INC., | G049060 |
| Cross-complainant and Respondent, | (Super. Ct. No. 30-2008-00104227) |
| v. | O P I N I O N |
| MISSION POOLS OF ESCONDIDO, INC., | |
| Cross-defendant and Appellant; | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | |
| Intervener and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Andrew P. Banks, Judge. Affirmed in part, reversed in part, and remanded.

Murchison & Cumming and Edmund G. Farrell III for Cross-defendant and Appellant.

Wood, Smith, Henning & Berman, Kevin D. Smith, Yvette M. Dumas and Nicholas M. Gedo for Cross-complainant and Respondent and for Intervener and Respondent.

* * *

**INTRODUCTION**

Jeffrey Epp suffered severe injuries after diving into a swimming pool at the St. Regis Resort, Monarch Beach (the St. Regis). Litigation followed, with Epp and his wife (together, the Epps) suing the owner of the St. Regis and the entities involved in the design and construction of the swimming pool. The defendants included Valley Crest Landscape Development, Inc. (Valley Crest), which was the general contractor for exterior improvements at the St. Regis, and Mission Pools of Escondido, Inc. (Mission Pools), the subcontractor that built the swimming pool.

Summary judgment motions and settlements reduced the litigation to a cross-complaint by Valley Crest and its insurer, National Union Fire Insurance Company of Pittsburgh, PA (National Union), against Mission Pools. Valley Crest sought to recover the amount it spent in the litigation based on a claim of express indemnity under the terms of the subcontract with Mission Pools. National Union sought to recover attorney fees and costs it had spent for Valley Crest's defense and settlement of the Epps' claims pursuant to the policy of general liability insurance that National Union had issued to Valley Crest. National Union proceeded on a claim it was equitably subrogated to Valley Crest's claims against Mission Pools.

The trial court conducted a two-part bench trial on the cross-complaint, found in favor of both Valley Crest and National Union on their respective claims, and awarded them the full amount of recovery sought. In this appeal from the judgment, Mission Pools makes three contentions: (1) the cross-complaint was time-barred under Code of Civil Procedure, section 337.1, subdivision (a) (section 337.1(a)) (all code references are to the Code of Civil Procedure); (2) the trial court erred by finding

2

National Union could recover on its claim for equitable subrogation because, under the element of balancing the equities, National Union should bear the loss; and (3) the trial court erred by denying Mission Pools a jury trial on Valley Crest's claim for express indemnity.

As to the first contention, we conclude section 337.1(a) does not apply to claims for express indemnity, and, therefore, the first amended cross-complaint was timely. As to the second contention, we conclude the trial court did not abuse its discretion by finding that National Union was entitled to recover based on equitable subrogation. The trial court erred, however, by denying Mission Pools a jury trial on Valley Crest's claim for express indemnity. We therefore reverse the judgment on that claim and remand for further proceedings, but in all other respects affirm.

**FACTS AND PROCEDURAL HISTORY**

**I.**

**Background: The Parties, Contracts, and Construction
of the Swimming Pool**

The St. Regis is a resort facility located in Dana Point and is owned by CPH Monarch Hotel, LLC (CPH). STO Design Group (STO) designed all of the swimming pools and improvements at the St. Regis. Lifescapes, International (Lifescapes) was a design consultant to the St. Regis and was responsible for its overall "design concept," including the swimming pools. Valley Crest served as general contractor for all exterior improvements at the St. Regis, and, in November 2000, entered into a construction agreement with CPH (the Construction Agreement). Paragraph 12 of the Construction Agreement contained an indemnity provision requiring Valley Crest to defend and indemnify CPH for any claims arising out of Valley Crest's work.

Valley Crest entered into a construction subcontract with Mission Pools (the Subcontract) to build four separate pools and associated plumbing and mechanical

3

equipment. Although the Subcontract initially required Mission Pools to install signage and decktop depth markers, those requirements later were removed from its scope of work, and Valley Crest installed the markers.

The indemnity provision in the Subcontract stated: "Subcontractor [(Mission Pools)] indemnifies and holds Contractor [(Valley Crest)] harmless from and against any and all claims, demands or actions made by any person or entity, whether valid or not, arising out of the performance by Subcontractor, including, without limitation, its employees, agents, and sub-subcontractors of this subcontract. Subcontractor agrees to reimburse Contractor upon demand for any expenses, including attorney's fees, incurred by Contractor in defending against or dealing with any such claims, demands, or actions. [¶] Subcontractor specifically obligates itself to Contractor in the following respects . . . [¶] . . . [¶] . . . Subcontractor shall protect, hold free and harmless, defend and indemnify Contractor and Owner . . . from all liability, penalties, costs, losses, damages, expenses, causes of action, judgments or other claims resulting from injury to or death sustained by any person . . . , which injury [or] death . . . arises out of Subcontractor's performance of work under this Subcontract. Subcontractor's aforesaid indemnity and hold harmless obligation shall apply to any act or omission, willful misconduct or negligent conduct, whether active or passive, on the part of Subcontractor or its agents, sub-contractors or employees."

Construction of the swimming pool in which Epp was injured was completed in July 2001. The Orange County Health Care Agency, the Environmental Health Department, and CPH approved the pool and determined it could be open for use in August 2001. Valley Crest accepted completion of the pool from Mission Pools. Since November 2001, neither Valley Crest nor Mission Pools has had any involvement with any of the swimming pools at the St. Regis.

In April 2007, National Union issued a policy of commercial general liability insurance (the National Union Policy) with Valley Crest as the named insured.

4

The National Union Policy provided: "[National Union] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages."

## II.

### The Epps' Litigation, Theories of Liability, and Valley Crest's Tender of Defense to Mission Pools

On September 15, 2007, Epp dived into the shallow end of one the swimming pools at the St. Regis. Epp, who was intoxicated at the time, seriously injured his spine and was rendered a quadriplegic.

In March 2008, the Epps filed a complaint against the St. Regis, Starwood Hotels & Resorts Worldwide, Inc., and Starwood Hotels & Resorts Management Company, Inc., for negligence and loss of consortium. The complaint was answered by CPH.[1] The Epps later amended their complaint to add Valley Crest, Mission Pools, STO, and Lifescapes, as defendants.

In May 2008, Valley Crest tendered its defense to Mission Pools and requested that it defend and indemnify Valley Crest pursuant to the indemnity provision of the Subcontract. Mission Pools never responded to the tender. In July 2008, Valley Crest filed a cross-complaint against Mission Pools for express indemnity based on its alleged breach of the indemnity provision of the Subcontract.

The Epps filed a first amended complaint in May 2009. As relevant here, the first amended complaint alleged, "[the] pool facility failed to provide any visible and effective and legible and conspicuous warnings/signage/depth markings on the pool deck and pool vertical walls nor in the pool area itself that complied with reasonable standards

---

[1] Starwood Hotels & Resorts Worldwide, Inc., and Starwood Hotels & Resorts Management Company, Inc., were sued erroneously. The parties to this appeal stipulated that CPH owned the St. Regis.

5

of care." Through discovery, the Epps refined their claims, and they identified the following defects as allegedly contributing to their injuries: (1) "[t]he vertical tile depth markers were partially submerged, making them illegible"; (2) "faded deck top depth markers"; (3) "[p]oor contrast on the signs containing 'No Diving' warning"; (4) "[p]oor location of signs"; (5) "[l]ack of fence between pools so users were not directed to entrance near 'No Diving' sign"; (6) "[f]ailure of hotel to enforce its rule directing users to not use pool after alcohol intake"; and (7) use of colored (French gray) plaster for the swimming pool.

Only points (1) and (7) applied specifically to work performed by Mission Pools. The final point, use of colored plaster, was based on a document in the files of Mission Pools entitled, "Plaster Fact Sheet," which listed an advantage of colored plaster as giving the appearance of greater depth. This fact sheet referred to a plaster color as "French Gray" and was signed by a representative of Lifescapes.

French gray plaster was used to coat the bottoms of several large fountains at the St. Regis. The Epps' expert opined that French gray plaster was also used for the swimming pool in which Jeffrey Epp was injured. The expert testified in her deposition that the swimming pool had been surfaced with a white Portland cement that had a grayish tint to it. The grayish tint made the pool appear deeper than it was. Other testimony and evidence established that white plaster was used for the swimming pool.

**III.**

**Summary Judgment Motions and Settlement
of the Epps' Claims**

STO, Lifescapes, Valley Crest, and Mission Pools brought motions for summary judgment based on the statute of limitations of section 337.1(a). Mission Pools also asserted it did not use French gray plaster to surface the pools and the vertical tile depth markers it installed did not contribute to the Epps' injuries. Mission Pools submitted portions of the deposition transcript of Epp, who testified he "really didn't see"

6

the depth markers and "didn't stop and stare at [them] to try and see exactly what [they] said."

The trial court granted the motions brought by STO and Lifescapes. The court granted the motion brought by Mission Pools but only as to the Epps' first amended complaint. The trial court denied Valley Crest's motion on the ground Valley Crest had failed to properly object to evidence that French gray plaster was used for the pool. STO, Lifescapes, and Mission Pools had properly objected to the evidence, and their objections were sustained, leading to summary adjudication in their favor on the issue of use of French gray plaster. Nevertheless, the court denied Mission Pools's motion for summary judgment as against Valley Crest's cross-complaint. The court stated: "Since Valley Crest's Motion was denied, this also must be denied."

The Epps settled their claims with all defendants. The Epps settled with CPH for $4.5 million, with Lifescapes for $15,000, and with STO for a waiver of costs. In March 2012, the Epps' claims against Valley Crest and Mission Pools, and CPH's express indemnity claim against Valley Crest, were resolved by an agreement pursuant to which Valley Crest and Mission Pools together paid $250,000 to the Epps and CPH. Valley Crest's contribution to this settlement was $10,000 to each of the Epps and $30,000 to CPH for a total of $50,000. Mission Pools's contribution to this settlement was $65,000 to each of the Epps and $70,000 to CPH for a total of $200,000.

**IV.**

**Valley Crest's Cross-complaint and
National Union's Subrogation Claim**

In July 2012, National Union intervened in, and was added as a cross-complainant to, Valley Crest's cross-complaint against Mission Pools. The first amended cross-complaint of Valley Crest and National Union (the first amended cross-complaint) asserted a cause of action for express indemnity by Valley Crest, a cause of action for equitable subrogation by National Union, a cause of action for

7

declaratory relief by both Valley Crest and National Union, and a cause of action for contribution by both Valley Crest and National Union.

The first amended cross-complaint alleged Valley Crest was obligated under the Construction Agreement to defend and indemnify CPH in the action brought by the Epps and that Valley Crest incurred $202,096.61 in attorney fees and costs defending CPH in that action. The first amended cross-complaint also alleged that pursuant to the indemnity provision in the Subcontract, Valley Crest had incurred $419,064.93 in attorney fees and costs that Valley Crest spent defending itself in the action brought by the Epps and had spent $50,000 in settling that action. Pursuant to the terms of the National Union Policy, Valley Crest paid the first $250,000 in losses as a self-insured retention. In total, the first amended cross-complaint sought to recover $671,161.54 from Mission Pools.

## V.

## Trial, Findings, and Judgment

Trial on the first amended cross-complaint was undertaken in two phases. In the first phase, National Union's claim for equitable subrogation was tried. In that claim, National Union sought to recover (1) attorney fees and settlement costs it had paid in the defense of Valley Crest pursuant to the National Union Policy and (2) the fees incurred by CPH in its defense pursuant to the additional insured endorsement. In a tentative decision, the trial court found that, by failing to accept the tender of defense when first made, Mission Pools had forfeited its right to seek allocation of the claimed attorney fees and settlement costs between the claims related to the work of Mission Pools and unrelated claims. The court awarded National Union the full amount it paid in the defense of Valley Crest, the full amount National Union paid in defense of CPH, and the full amount National Union paid in settlement, for a total recovery of $421,161.54.

In the second phase, Valley Crest's claim for express indemnity under the terms of the Subcontract was tried. The express indemnity claim initially was set for a

8

jury trial. Before empanelling the jury, the trial court decided the express indemnity claim was, in effect, for specific performance of the indemnity provision (rather than for damages) and, therefore, was an action in equity for which there was no right to a jury trial. After receiving additional evidence, the trial court found that under the terms of the indemnity provision of the Subcontract, Valley Crest was entitled to recover the entire $250,000 self-insured retention.

The trial court issued a statement of decision making these findings:

1. Pursuant to "express indemnity principles," Valley Crest is entitled to recover out-of-pocket attorney fees and costs incurred in its defense of the Epps' complaint.

2. Pursuant to equitable subrogation principles, National Union is entitled to recover attorney fees and costs above Valley Crest's self-insured retention, which National Union paid for Valley Crest's defense of the Epps' complaint.

3. No apportionment would be made between attorney fees and costs related and unrelated to Mission Pools's work.

4. National Union is entitled to recover $202,096.91 in attorney fees and costs it paid in connection with its defense of CPH.

5. National Union is entitled to recover the $50,000 amount it paid toward settlement.

6. There would be no apportionment of the $50,000 paid in settlement between amounts related and amounts unrelated to Mission Pools's work.

7. The amount of attorney fees and costs incurred in Valley Crest's defense was reasonable.

8. The statute of limitations of section 337.1 did not bar Valley Crest's claims or National Union's claims.

9

Judgment was entered against Mission Pools and in favor of Valley Crest for $282,496 and in favor of National Union for $494,002.37. Mission Pools timely appealed from the judgment.

## DISCUSSION

## I.

### Statute of Limitations

Mission Pools contends Valley Crest's claim for express indemnity is time-barred under section 337.1(a), which states: "(a) Except as otherwise provided in this section, no action shall be brought to recover damages from any person performing or furnishing the design, specifications, surveying, planning, supervision or observation of construction or construction of an improvement to real property more than four years after the substantial completion of such improvement for any of the following: [¶] (1) Any patent deficiency in the design, specifications, surveying, planning, supervision or observation of construction or construction of an improvement to, or survey of, real property; [¶] (2) Injury to property, real or personal, arising out of any such patent deficiency; or [¶] (3) Injury to the person or for wrongful death arising out of any such patent deficiency."

Section 337.1(a) is inapplicable. Valley Crest sought recovery from Mission Pools based on the indemnity provision in the Subcontract.[2] Thus, Valley Crest brought an action on a contract, not an action to recover damages on any of the grounds

---

[2] "The obligation of indemnity, which we have defined as 'the obligation resting on one party to make good a loss or damage another has incurred' [citations] may arise under the law of this state from either of two general sources. First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances. Second, it may find its source in equitable considerations brought into play either by contractual language not specifically dealing with indemnification or by the equities of the particular case. [Citations.]" (*E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 506-507.)

10

listed in section 337.1(a).  When, as here, the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty is determined from the contract. (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 633.)

An action for indemnity—express or implied—is not included within section 337.1(a)'s definition of the word "action."  In contrast, section 337.15, which sets forth a 10-year statute of limitations for latent deficiencies, expressly defines the word "'action'" to include "an action for indemnity."  (§ 337.15, subd. (c).)  Subdivision (c) of section 337.15 reads:  "As used in this section, 'action' includes an action for indemnity brought against a person arising out of that person's performance or furnishing of services or materials referred to in this section, except that a cross-complaint for indemnity may be filed pursuant to subdivision (b) of Section 428.10 in an action which has been brought within the time period set forth in subdivision (a) of this section."  This covers both contractual (express) and implied indemnity.  (*FNB Mortgage Corp. v. Pacific General Group* (1999) 76 Cal.App.4th 1116, 1127.)  Section 337.1 does not include the same or a similar provision.  "When terms are used in some statutes but not in other related statutes, we should not imply the terms into the statute from which they were excluded."  (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1542, citing *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 576.)

Section 337.1 was enacted in 1967.  (See 13B West's Ann. Code Civ. Proc. (2006 ed.) amend. history foll. § 337.1, p. 354.)  Section 337.15 was enacted in 1971. (*FNB Mortgage Corp. v. Pacific General Group*, *supra*, 76 Cal.App.4th at p. 1126.)  If the Legislature believed the word "action" was broad enough to include an action for indemnity, then it would have had no need to expressly define "action" to include indemnity in section 337.15, subdivision (c).

Mission Pools relies on *Wagner v. State of California* (1978) 86 Cal.App.3d 922 (*Wagner*) to support its argument that section 337.1(a) applies to express indemnity

claims. In *Wagner*, *supra*, 86 Cal.App.3d at page 928, the Court of Appeal concluded, with respect to equitable indemnity: "The argument that the limitations period of section 337.1 is inapplicable because defendant seeks indemnity is unacceptable. Since the limitations period set forth in section 337.1 would preclude any action other than one excepted by that section, it follows that an action for indemnity based on the same events should also be precluded."

We decline to follow *Wagner* for several reasons. First, *Wagner* did not consider section 337.15, which, unlike section 337.1, defines the word "action" to include an action for indemnity. Second, *Wagner* dealt with equitable indemnity, and, here, we deal with a claim for express indemnity. Because the claim for express indemnity was based on a written contract, it was subject to the statute of limitations of section 337, subdivision 1. Third, *Wagner* is contrary to the principle that "[a] tort defendant retains the right to seek equitable indemnity from another tortfeasor even if the plaintiff's action against the cross-defendant is barred by the statute of limitations." (*Valley Circle Estates v. VTN Consolidated, Inc.* (1983) 33 Cal.3d 604, 611.) For that reason, the court that issued *Wagner* declined to extend it beyond section 337.1. (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1154-1155.) Finally, in *Crouse v. Brobeck, Phleger & Harrison*, *supra*, 67 Cal.App.4th at page 1542, the Court of Appeal criticized *Wagner* on the ground "[it] reached its conclusion without citing, accommodating or distinguishing the existing Supreme Court authority holding that claims for implied indemnity do not accrue until the indemnitee has suffered actual loss through payment."

We therefore conclude the statute of limitations of section 337.1 is inapplicable to Valley Crest's claim for express indemnity and National Union's claim for equitable subrogation, which arose out of the indemnity claim. Valley Crest was, in effect, suing Mission Pools for breach of contract for its alleged failure to fulfill its obligations under the Subcontract. The statute of limitations for breach of a written contract is four years. (§ 337, subd. 1.) A cause of action for breach of an express

12

indemnity agreement (contractual indemnity) accrues when the indemnitor sustains the loss by paying the money sought to be indemnified from the indemnitee. (*Fidelity & Deposit Co. v. Whitson* (1960) 187 Cal.App.2d 751, 758; see *Valley Circle Estates v. VTN Consolidated, Inc.*, *supra*, 33 Cal.3d at p. 611 ["'The indemnity action, unlike the plaintiff's claim, does not accrue for statute of limitations purposes when the original accident occurs, but instead accrues at the time the tort defendant pays a judgment or settlement as to which he is entitled to indemnity.'"].)

Under those accrual rules, Valley Crest's cause of action for express indemnity accrued at the earliest in May 2008, when Valley Crest tendered its defense to Mission Pools. Valley Crest filed its cross-complaint just two months later, and therefore the express indemnity claim was timely. (§ 337, subd. 1.)

## II.

## Balancing the Equities

A. *Introduction*

The trial court found that National Union was entitled to recover on its claim against Mission Pools for equitable subrogation. "In the insurance context, subrogation takes the form of an insurer's right to be put in the position of the insured for a loss that the insurer has both insured and paid. [Citations.] When an insurance company pays out a claim on a property insurance policy, the insurance company is subrogated to the rights of its insured against any wrongdoer who is liable to the insured for the insured's damages." (*State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098, 1106 (*State Farm*).)

Here, National Union is the insurer, Valley Crest is the insured, and Mission Pools is the defendant/indemnitor. National Union provided Valley Crest a defense and paid to settle with the Epps based on Valley Crest's claim under the National Union Policy. The trial court found that National Union stood in the place of Valley

13

Crest to the extent of those payments and therefore could recover from Mission Pools under the express indemnity provision of the Subcontract. Mission Pools argues National Union was not entitled to be equitably subrogated because its equitable position was, on balance, inferior to that of Mission Pools.

B. *Standard of Review*

Equitable subrogation is, as the name suggests, based on equity. (*State Farm*, *supra*, 143 Cal.App.4th at p. 1106.) After a trial court has exercised its equitable powers, the appellate court reviews the judgment under the abuse of discretion standard. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256.)

"'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.] [¶] 'The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria.'" (*Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1089.) The scope of the trial court's discretion is limited by law governing the subject of the action taken. (*Ibid.*) An action that transgresses the bounds of the applicable legal principles is outside the scope of the trial court's discretion and, therefore, is deemed an abuse of discretion. (*Ibid.*)

In applying the abuse of discretion standard, we determine whether the trial court's factual findings are supported by substantial evidence and independently review its legal conclusions. (*County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1230.)

As this appeal follows a bench trial, we also apply the doctrine of implied findings. The trial court found that National Union was entitled to recover under equitable subrogation principles, but made no specific findings on balancing or weighing

14

the equities. No objections were made to the statement of decision, and no party brought omissions or ambiguities in it to the trial court's attention, so we will infer the trial court made findings favorable to the prevailing party on all issues necessary to support the judgment. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.)

C. *Elements of Equitable Subrogation*

"Generally, an insurer on paying a loss is subrogated in a corresponding amount to the insured's right of action against any person responsible for the loss. [Citation.] California law is in accord that insurance companies may be subrogated to the rights of their insureds. [Citation.]" (*Rossmoor Sanitation, Inc. v. Pylon, Inc.*, *supra*, 13 Cal.3d at pp. 633-634.) "[A] general liability insurer that has paid a claim to a third party on behalf of its insured may have an equitable right of subrogation against (1) other parties who contributed to the harm suffered by the third party (joint tortfeasors) under an equitable indemnity theory, and (2) other parties who are legally liable to the insured for the harm suffered by the third party (such as by an indemnification agreement) under a contractual indemnity theory." (*Interstate Fire & Casualty Ins. Co. v. Cleveland Wrecking Co.* (2010) 182 Cal.App.4th 23, 32 (*Interstate Fire*).) This case falls under the second category: National Union's subrogation claim was based on allegations that Mission Pools was legally liable to Valley Crest under the terms of the indemnity provision of the Subcontract.

Case law has identified eight elements of an insurer's cause of action for equitable subrogation.[3] The only element in issue here is No. 7—balancing the equities;

---

[3] The eight elements are: "'[1] the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; [2] the claimed loss was one for which the insurer was *not* primarily liable; [3] the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; [4] the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; [5] the insured has an existing, assignable cause of action

15

that is, "justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer." (*Interstate Fire*, *supra*, 182 Cal.App.4th at pp. 33-34.) "[T]he aim of equitable subrogation is to shift a loss for which the insurer has compensated its insured to one who caused the loss, or who is legally responsible for the loss caused by another and whose equitable position is inferior to the insurer's. [Citations.]" (*State Farm*, *supra*, 143 Cal.App.4th at p. 1112.)

D. *Balancing the Equities: The* Interstate Fire *Opinion*

Though easily stated in general terms, the element of balancing the equities lacks specificity in details. "'[T]here is no facile formula for determining superiority of equities, for there is no formula by which to determine the existence or nonexistence of an equity except to the extent that certain familiar fact combinations have been repeatedly adjudged to create an equity in the surety or the third party. . . . '" (*State Farm*, *supra*, 143 Cal.App.4th at p. 1112.)

Nonetheless, *Interstate Fire*, *supra*, 182 Cal.App.4th 23, provides a valuable guideline for how to balance the equities in an equitable subrogation claim by an insurer based on the insured's express indemnity claim against the defendant—i.e., the situation presented here. In *Interstate Fire*, Webcor Construction, Inc. (Webcor), was the general contractor for a construction project. (*Id.* at p. 28.) Cleveland Wrecking Company (Cleveland) and Delta Steel Erectors (Delta) were subcontractors on the project. (*Ibid.*) Cleveland and Delta entered into similar subcontracts with Webcor,

---

against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; [6] the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; [7] justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and [8] the insurer's damages are in a liquidated sum, generally the amount paid to the insured.'" (*Interstate Fire*, *supra*, 182 Cal.App.4th at pp. 33-34, quoting *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1292.)

16

which had express indemnity provisions. (*Ibid.*) Cleveland agreed to indemnify Webcor from "'claims, demands, causes of action, damages, costs, expenses, actual attorney's fees, losses or liability, in law or in equity, of every kind and nature whatsoever ("Claims") arising out of or in connection with Subcontractor's operations to be performed under this Agreement for, but not limited to . . . Personal injury . . . caused or alleged to be caused in whole or in part by any negligent act or omission of Subcontractor [Cleveland].'" (*Ibid.*) Cleveland was required to, at its "'own cost, expense and risk, defend all Claims . . .' by third parties, pay any judgment, and reimburse Webcor and certain others for legal expenses they incurred." (*Ibid.*) Both Cleveland and Delta had agreed to procure liability insurance with Webcor as an additional insured, but only Delta complied. (*Id.* at pp. 28-29.)

While working on the project, a Delta employee (Thelbert Allen Frisby) suffered serious injuries caused, at least in part, by Cleveland. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 29.) Frisby sued Cleveland for negligence and sued Webcor for negligence, premises liability, and negligent provision of unsafe equipment. (*Ibid.*) Webcor tendered its defense and indemnification to Cleveland pursuant to the express indemnity terms of its subcontract. Cleveland rejected the tender. (*Ibid.*) Webcor also tendered its defense and indemnification to Delta, which accepted the tender. (*Ibid.*) Webcor filed a cross-complaint against Cleveland for express indemnification, equitable indemnification, and breach of contract. (*Ibid.*) Webcor dismissed the cross-complaint and the parties expressly reserved the insurer's right to bring a subrogation claim in a separate action. (*Id.* at pp. 29-30.)

Webcor and Frisby entered into a settlement agreement by which Webcor would pay him $575,000. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 30.) The trial court approved the agreement as a good faith settlement. (*Ibid.*) The insurer funded the full amount of the settlement payment and paid over $152,000 in attorney fees and costs to defend Webcor against Frisby's claims. (*Ibid.*) Cleveland also entered into a

17

settlement agreement with Frisby, which the trial court approved as a good faith settlement.  (*Ibid.*)

The insurer filed a complaint for subrogation against Cleveland.  (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 30.)  The complaint alleged that Cleveland breached its contract with Webcor by failing to defend and indemnify Webcor.  (*Ibid.*)  Cleveland demurred to the subrogation complaint on the ground the insurer was not in a superior position because there were no allegations that Cleveland's breach of contract had caused the loss.  (*Ibid.*)  After the trial court sustained the demurrer with leave to amend, the insurer filed an amended complaint adding allegations that Cleveland's negligence was a proximate cause of Frisby's injuries and that Cleveland had violated its subcontract by failing to obtain insurance covering Webcor.  (*Ibid.*)  The insurer sought judgment for all amounts it had spent to defend against and settle the claims against Webcor in the action brought by Frisby.  (*Ibid.*)  The insurer contended it was subrogated to Webcor's claims against Cleveland for breach of its express indemnity obligation.  (*Ibid.*)

Cleveland demurred to the amended complaint, again arguing the insurer did not have superior equities and Webcor did not incur damages by Cleveland's alleged breach of the indemnification provision of the subcontract.  (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 31.)  The trial court sustained the demurrer without leave to amend on the grounds the determination of good faith settlement cut off Webcor's ability to sue Cleveland for indemnity and the insurer's equitable position was not superior to Cleveland's because Webcor had sustained no damages resulting from Cleveland's breach of the indemnity provision.  (*Ibid*.)

The Court of Appeal reversed.  (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 28.)  On the issue of balancing the equities, the court concluded, "it can reasonably be inferred that [the insurer]'s equitable position is superior to that of Cleveland."  (*Id.* at p. 37.)  The court reached its conclusion based on several factors.

The first factor was that Cleveland was alleged to have caused the loss in addition to its alleged liability for the loss under a contractual indemnity provision, and "Cleveland's alleged negligence toward Frisby is relevant to the respective equities of [the insurer] and Cleveland." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 39.) "[T]he first amended complaint alleges that Cleveland's negligence caused Frisby's lawsuit, and precipitated the lawsuit against Webcor and Cleveland, which made it necessary for Webcor to incur the costs of defense and settlement. Since it is not alleged that [the insurer] (or even Webcor) was at fault, the allegations of the first amended complaint give rise to the inference that Cleveland should cover Webcor's defense and settlement costs." (*Id.* at pp. 40-41.)

The second factor was the nature of the insurer's and Cleveland's agreements to indemnify Webcor. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 42.) "While Cleveland agreed to indemnify Webcor in the subcontractor agreement pertaining to the project from which the underlying injury arose, [the insurer] was a third party insurer uninvolved in the project." (*Ibid.*) Cleveland and the insurer did not agree to indemnify the same loss. (*Id.* at p. 44.) Cleveland agreed to indemnify and hold harmless Webcor from all claims, including personal injury claims, arising out of Cleveland's work on the construction project. (*Ibid.*) By contrast, the insurer provided coverage to Webcor for amounts it became legally obligated to pay as damages because of bodily injury to which the insurance applied, without limitation to liability arising out of Cleveland's work on the construction project. (*Ibid.*)

Put another way, the equities tipped in favor of the insurer because Cleveland agreed to indemnify Webcor specifically against the loss incurred. "An entity which, like Cleveland, agrees to indemnify *the other party to the underlying transaction* has a liability of greater primacy than an independent insurer that insures against loss. [Citations.] The parties directly involved in the transaction are better able to evaluate and control the risk. Therefore, for purposes of weighing the equities in an equitable

19

subrogation case, and absent language in the insurance policy or indemnification agreement leading to a contrary conclusion (which the parties here do not contend exists), the Agreement between the parties who were connected to the incident giving rise to the loss (Webcor and Cleveland as workers at Frisby's job site) creates the greater equitable responsibility for indemnification, as compared to that of the general liability insurer . . . ." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 44.)

The Court of Appeal also considered the fact the insurer had accepted premiums, but concluded that factor was not dispositive. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 45.) "In our view, the fact that [the insurer] accepted premiums is not particularly significant, since every insurer that pays a loss on behalf of its insured will have accepted premiums for the risk. Furthermore, while [the insurer] was compensated for undertaking the risk of loss, so was *Cleveland*, which accepted consideration for the performance of its obligations under the Webcor-Cleveland subcontract. [Citation.] Finally, while it may be that [the insurer] merely did what it was obligated to do under the insurance policy, that does not change the fact that Cleveland did *not* do what it was allegedly obligated to do under the indemnification provision, after it allegedly caused the loss." (*Ibid.*)

Finally, the Court of Appeal considered public policy: "In our view, it is not a good idea to reward parties who refuse to fulfill their alleged indemnification obligations, particularly under the rubric that they are in as good or better an *equitable* position as the insurer that did fulfill its alleged indemnification obligation. We believe it is more prudent to permit subrogation, so that a party with an alleged contractual indemnification obligation will be encouraged to step up in the underlying case and either fulfill the obligation (and implicitly help settle the case) or resolve any dispute over the application of the indemnification obligation. If permitting subrogation to the insurer in any way results in a windfall (because the insurer that accepted premiums to insure against the loss may now shift the loss to the other indemnitor), it would be better for the

20

windfall to go to the one that undisputedly fulfilled its contractual obligations, rather than to the one that allegedly breached them." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 47.) Cleveland, which allegedly contributed to the loss, did not fulfill its contractual obligations to Webcor, while the insurer, which had nothing to do with the incident leading to the loss, abided by its contractual obligation to pay for it. (*Ibid.*) "The comparison, therefore, is between one party who had nothing to do with causing the loss but abided by its contractual obligation to pay for it, and another party who caused the loss and then shunned its contractual obligation to pay it." (*Ibid.*)

E. *Balancing the Equities Between National Union and Mission Pools*

At least in outline form, this case resembles *Interstate Fire*. National Union was subrogated to Valley Crest's right under the express indemnity provision of the Subcontract, just as the insurer in *Interstate Fire* was subrogated to Webcor's rights under the subcontract with Cleveland. Valley Crest in effect obtained insurance for the loss from two sources: the National Union Policy and the indemnity provision of the Subcontract. Who should bear the loss, Mission Pools or National Union? We turn to the factors addressed in *Interstate Fire*.

1. *Cause of the Loss.* National Union did not cause the loss or have anything to do with causing Epp's injuries. Mission Pools was alleged to have contributed to causing Epp's injuries; however, the factual basis for Mission Pools's liability was slim. Of the seven theories of liability asserted by the Epps, only two concerned work performed by Mission Pools: (1) "[t]he vertical tile depth markers were partially submerged, making them illegible" and (2) use of French gray plaster for the pool surface. In granting Mission Pools's motion for summary judgment, the trial court ruled, "there is no evidence that French gray plaster was actually used as opposed to merely approved." In moving for summary judgment, Mission Pools presented evidence that placement of the vertical tile depth markers was not a cause of Epp's injuries.

21

The statement of decision is silent on the issue whether Mission Pools contributed in some fashion to Jeffrey Epp's injuries. National Union argues we should invoke the doctrine of implied findings and infer the trial court made a factual finding that Mission Pools contributed to Epp's injuries by placing the swimming pool's depth markers below the water line. Implied findings, like express ones, are reviewed under the substantial evidence standard. (*Fladeboe v. American Isuzu Motors Inc.*, *supra*, 150 Cal.App.4th at p. 60.) Here, the parties stipulated as fact: "[R]egarding Mission Pools' work, plaintiffs alleged that the vertical wall markings that state pool depth are halfway submerged, making them illegible, such that pool patrons are unable to correctly read these depth markings. *These allegations were defeated when the Court granted Mission Pools' motion for summary judgment.*" (Italics added.)

2. *Nature of Indemnity Agreements.* Mission Pools agreed to indemnify Valley Crest specifically against the type of loss incurred, while National Union provided general liability insurance. "An entity which, like [Mission Pools], agrees to indemnify *the other party to the underlying transaction* has a liability of greater primacy than an independent insurer that insures against loss." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 44.) National Union was a third party insurer that was not involved in the construction project. (See *id.* at p. 42.)

CPH was named as an additional insured under the National Union Policy. National Union's decision to accept CPH's tender of defense was based not only on the National Union Policy, but also on the indemnity provision of the Construction Agreement and the obligation imposed by *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541. In *Crawford*, the California Supreme Court held a contractual duty to defend under a construction subcontract is triggered merely by allegations that damage or loss was caused by construction defects arising from the subcontractor's negligence, even if a trier of fact later finds the subcontractor was not negligent. (*Id.* at pp. 547, 568.)

22

3. *Receipt of Premiums.* National Union's receipt of premiums from Valley Crest is a neutral factor. Indeed, "while [National Union] was compensated for undertaking the risk of loss, so was [Mission Pools], which accepted consideration for the performance of its obligations under the . . . [S]ubcontract." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 45.)

4. *Compliance with Contractual Obligations.* So far, the equities line up fairly evenly between National Union and Mission Pools. In our opinion, what tips the balance against Mission Pools, and leads us to conclude the trial court did not abuse its discretion, is that Mission Pools did not comply with its obligations under the Subcontract. Mission Pools did not even respond to Valley Crest's tender of defense. In contrast, National Union did everything it was supposed to do to fulfill its obligations under the terms of the National Union Policy. Mission Pools's contractual duty to defend and indemnify under the Subcontract was triggered by the allegations that Missions Pools's negligence contributed to the damage or loss suffered by the Epps. (*Crawford v. Weather Shield Mfg., Inc.*, *supra*, 44 Cal.4th at pp. 547, 568.) Thus, Mission Pools had an obligation to accept Valley Crest's tender of defense when it was made and to provide Valley Crest a defense at least up to the point at which the trial court granted Mission Pools's motion for summary judgment against the Epps.

In addition, the Subcontract required Mission Pools to obtain and maintain in force a policy of commercial general liability insurance with Valley Crest as an additional insured. In April 2001, Mission Pools obtained a commercial general liability policy issued by The Insurance Corporation of New York (ICNY). In May 2008, Valley Crest made a tender of defense to ICNY under the ICNY policy. ICNY declined the tender on the ground that the policy was cancelled as of April 1, 2004, and an injury caused by an occurrence during the policy period was needed to trigger coverage.

The failure by Mission Pools to maintain the insurance required by the Subcontract did not cause the loss; that is, the damages incurred as a result of Epp's

23

injuries. (See *Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 512 (*Patent Scaffolding*) [insurer's loss was not caused by the contractor's failure to obtain insurance or to indemnify].) But Mission Pools's failure to fulfill its obligation to maintain insurance supports a finding that National Union was in the superior equitable position. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 47.)

Mission Pools argues that we should consider the fact that Valley Crest's motion for summary judgment was denied only because Valley Crest had failed to object properly to evidence that French gray plaster had been used to surface the pool. Mission Pools properly objected to that evidence and its objections were sustained, leading to summary adjudication in its favor. The trial court denied Mission Pools's motion for summary judgment as against Valley Crest's cross-complaint only because Valley Crest's motion for summary judgment was denied. Mission Pools raises a valid point: why should it pay for Valley Crest's litigation mistakes? Though valid, the point is not persuasive because the problem with objections would not have arisen if Mission Pools had fulfilled its contractual obligation and accepted Valley Crest's tender of defense in the first place.

F. *The* Patent Scaffolding *Opinion*

Finally, we address *Patent Scaffolding*, *supra*, 256 Cal.App.2d 506, on which Mission Pools heavily relies. In *Patent Scaffolding*, a subcontractor was hired by a general contractor to perform certain work on a building. (*Id.* at p. 508.) Their contract required the general contractor to obtain fire insurance on the subcontractor's property at the job site, but the general contractor failed to do so. (*Ibid.*) A fire of unknown origin destroyed some of the subcontractor's property. (*Ibid.*) The subcontractor's fire insurers paid the subcontractor for the loss and sought to subrogate to the subcontractor's rights against the general contractor for its failure to obtain insurance. (*Ibid.*) The trial court permitted subrogation on the ground that the general contractor had agreed not only to

24

obtain fire insurance but also to indemnify the subcontractor against fire loss (despite the absence of an express indemnification provision in the contract). (*Id.* at pp. 508-509.)

The Court of Appeal reversed, holding that the insurers were not entitled to subrogation because the general contractor did not cause the fire and the insurers were merely paying a loss that they had agreed to insure. (*Patent Scaffolding*, *supra*, 256 Cal.App.2d at p. 512.) The Court of Appeal explained: "The insurers' loss was not caused by [the general contractor]'s failure to get insurance or to indemnify [the subcontractor]. The insurers' loss was caused by the fire, the very risk which each assumed, and [the general contractor]'s failure to perform its contractual duty had nothing to do with the fire." (*Ibid.*) The court held that when "two parties are contractually bound by independent contracts to indemnify the same person for the same loss, the payment by one of them to his indemnitee does not create in him equities superior to the nonpaying indemnitor, justifying subrogation, if the latter did not cause or participate in causing the loss." (*Id.* at p. 514.) The court added that "[i]f subrogation were permitted, the insurers who have accepted premiums to cover the very loss which occurred receive a windfall." (*Id.* at p. 516.)

Mission Pools argues *Patent Scaffolding* is analogous to this case because Mission Pools (the indemnitor) did not cause the loss while the National Union (the insurer) accepted premiums to cover the loss. But, as explained in *Interstate Fire*, *supra*, 182 Cal.App.4th at page 39: "(1) *Patent Scaffolding* did not involve a situation where, as here, the defendant *was* alleged to have caused the loss; (2) even where the defendant has not caused the loss, the equities may support the insurer where, as here, the defendant expressly promised to indemnify (not just to obtain insurance) in a contract related to the project from which the underlying loss occurred; and (3) the insurer's receipt of premiums to cover the type of loss that occurred, although a factor to be considered, does not preclude it from being in an equitably superior position to another party that contractually agreed to indemnify." The same distinctions pertain to this case. Here,

25

Mission Pools was alleged to have contributed to the loss, and, although ultimately exonerated, failed to fulfill its obligation under the indemnity provision of the Subcontract to accept Valley Crest's tender of defense and its obligation to maintain additional insurance.

Age and subsequent appellate court opinions have not been kind to *Patent Scaffolding*. In *Pylon, Inc. v. Olympic Ins. Co.* (1969) 271 Cal.App.2d 643, 651, decided just two years after *Patent Scaffolding*, the Court of Appeal cautioned that "[t]he holding in the *Patent Scaffolding* case does not constitute a rule applicable to every situation in which an insurer of an indemnitee seeks to hold the contractor-indemnitor on an indemnity contract." The Court of Appeal in *Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553, 557, criticized *Patent Scaffolding* as precluding subrogation in any case in which the defendant/indemnitor's negligence is not the cause of the insured's loss, "a result inconsistent with the rule articulated in *Patent Scaffolding* itself and the cases on which it relies." The Court of Appeal in *Interstate Fire* criticized *Patent Scaffolding* on the ground its holding rewarded the party that refused to fulfill its indemnification obligations. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 47.) The better policy, the *Interstate Fire* court explained, is to permit subrogation for an insurer that fulfilled its contractual obligations, even if the result was a windfall for the insurer. (*Ibid.*) To whatever extent *Patent Scaffolding* might be relevant here, we decline to follow it.

### III.

### Jury Trial on Valley Crest's Express Indemnity Claim

Mission Pools argues the trial court erred by denying it a jury trial on Valley Crest's express indemnity claim. The trial court concluded Mission Pools was not entitled to a jury trial on the express indemnity claim because Valley Crest was seeking the equitable remedy of specific performance. The trial court erred. The effect of our

26

reversal of this portion of the judgment is a remand for a jury trial on the issue of damages on Valley Crest's claim for express indemnity.

A. *Legal Remedy Sought in the First Amended Cross-complaint*

The form of relief sought in the complaint is a reliable indicator whether the action is legal or equitable. (*Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 694.) "'Actions at law *usually* seek a money judgment for damages, while equitable actions seek some form of specific relief and equity decrees are *usually* in personam.'" (*Id.* at pp. 695-696.)

In the express indemnity claim, Valley Crest alleged Mission Pools breached the terms of the indemnity provision of the Subcontract. As a remedy for breach, Valley Crest did not seek a decree of specific performance of the Subcontract. Instead, Valley Crest sought money damages in the form of "reimbursement" of the amounts of $419,064.93 in attorney fees and costs, $50,000 contributed to the settlement with the Epps, and $202,096.61 in attorney fees and costs paid to CPH. By seeking, in effect, money damages, Valley Crest's express indemnity claim was decidedly legal. No decree of specific performance appears in the judgment, which is a judgment for money damages.

In addition, the first amended cross-complaint did not allege inadequacy of legal remedy, which is necessary for specific performance. (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 803, p. 219.) "The basic rule is that governing equitable relief generally, i.e., specific performance will be granted only when the legal remedy, such as an action for damages, is inadequate." (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 24, p. 312.) By alleging, down to the penny, the precise amount of money sought to be recovered from Mission Pools, the first amended cross-complaint disclosed the legal remedy of damages was adequate. Because Valley Crest had an adequate legal

27

remedy, it was not entitled to specific performance. (*Canova v. Trustees of Imperial Irrigation Dist. Employee Pension Plan* (2007) 150 Cal.App.4th 1487, 1497.)

B. *No Waiver or Forfeiture of Jury Trial*

Valley Crest argues that Mission Pools waived any right it might have had to a jury trial by failing to object, or by making an ambiguous objection, when the trial court announced its tentative decision to hold a bench trial on the express indemnity claim. Valley Crest misconstrues the law and the record. Section 631, subdivision (f) lists the six ways by which a party can waive a jury trial.[4] Of these, only No. (3)—oral consent in open court—is arguably relevant. Mission Pools did not consent to a bench trial, and, in any case, such consent does not appear in the minutes.

On April 24, 2013, after the first phase of trial had been completed, the trial court asked counsel to address whether the express indemnity claim should be tried to a jury or to the court. After a lengthy discussion covering 30 pages of the reporter's transcript, the trial court decided to conduct a bench trial. During the course of the discussion, counsel for Mission Pools argued that Valley Crest failed to seek specific performance in its cross-complaint and "whether the fees are reasonable and necessary would be and . . . were of necessity would be a question for the jury." Counsel for Mission Pools argued the relief sought by Valley Crest was "not something that would typically be envisioned under specific performance" and Valley Crest had an adequate

---

[4] Section 631, subdivision (f) reads: "A party waives trial by jury in any of the following ways: [¶] (1) By failing to appear at the trial. [¶] (2) By written consent filed with the clerk or judge. [¶] (3) By oral consent, in open court, entered in the minutes. [¶] (4) By failing to announce that a jury is required, at the time the cause is first set for trial, if it is set upon notice or stipulation, or within five days after notice of setting if it is set without notice or stipulation. [¶] (5) By failing to timely pay the fee described in subdivision (b), unless another party on the same side of the case has paid that fee. [¶] (6) By failing to deposit with the clerk or judge, at the beginning of the second and each succeeding day's session, the sum provided in subdivision (e)."

28

remedy at law.  On this record, Mission Pools did not consent to waiver of a jury trial; moreover, the court minutes of April 24, 2013 do not include any such consent.

Denial of the right to a jury trial is reversible error per se, and no showing of prejudice is required of a party who lost at trial.  (*Martin v. County of Los Angeles*, *supra*, 51 Cal.App.4th at p. 698; see *Villano v. Waterman Convalescent Hospital, Inc.* (2010) 181 Cal.App.4th 1189, 1205.)  The judgment as to Valley Crest's express indemnity claim is therefore reversed and the matter remanded for further proceedings.

## DISPOSITION

The judgment is reversed and the matter is remanded with respect to Valley Crest's claim for express indemnity.  In all other respects, the judgment is affirmed.  In the interest of justice, no party shall recover costs on appeal.


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.

29

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VALLEY CREST LANDSCAPE DEVELOPMENT, INC.,<br><br>    Cross-complainant and Respondent,<br><br>        v.<br><br>MISSION POOLS OF ESCONDIDO, INC.,<br><br>    Cross-defendant and Appellant;<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>    Intervener and Respondent. | G049060<br><br>(Super. Ct. No. 30-2008-00104227)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

On the court's own motion, the above entitled unpublished opinion, filed June 26, 2015, is certified for publication in the Official Reports.  The opinion meets the standards for publication set forth in California Rules of Court, rule 8.1105(c)(2), (3), and (7).

FYBEL, J.

WE CONCUR:

ARONSON, ACTING P. J.

IKOLA, J.