Filed 6/10/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| PULTE HOME CORPORATION, | |
| Cross-complainant, | E068353 |
| v. | (Super.Ct.No. MCC1300147) |
| CBR ELECTRIC, INC., et al., | OPINION |
| Cross-defendants and Respondents; | |
| PRO COAT SYSTEMS, INC., | |
| Cross-defendant and Appellant; | |
| ST. PAUL MERCURY INSURANCE COMPANY, | |
| Intervener and Appellant. | |

APPEAL from the Superior Court of Riverside County. Craig Riemer, Judge. Reversed with directions.

The Aguilera Law Group, A. Eric Aguilera, and Raymond E. Brown for Intervener and Appellant.

1

Nicolaides Fink Thorpe Michaelides Sullivan, Jodi S. Green, Jeffrey N. Labovitch, and Kimberly A. Hartman for Cross-defendant and Appellant Pro Coat Systems, Inc., and Cross-defendants and Respondents CBR Electric, Inc. and The Jasper Companies.

Diem Law, Robin L. Diem; Hammons & Baldino, Ryan W. Baldino; Hammons & Associates, and Wallace W. Hammons for Cross-defendants and Respondents Masco Contractor Services of California, Inc. and Milgard Manufacturing, Inc.

No appearance for Cross-defendant and Respondent, Petersen-Dean, Inc.

This case involves the intersection of the legal principles governing an insurer's claim for equitable subrogation and a subcontractor's duty to defend a general contractor. After defending the general contractor in two construction defect actions, general liability insurer St. Paul Mercury Insurance Company (St. Paul) sought reimbursement of defense costs under an equitable subrogation theory against six subcontractors (defendants) that had worked on the underlying construction projects and whose contracts required them to defend the general contractor in suits involving allegations related to their work. After a bench trial, the court denied St. Paul's claim. Relying on *Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 514 (*Patent Scaffolding*), the trial court concluded St. Paul had not demonstrated it was fair to shift *all* of the defense costs to defendants because their failure to defend the general contractor had not caused the homeowners to bring the construction defect actions. St. Paul argues this conclusion misconstrues the law governing equitable subrogation and therefore constitutes an abuse of discretion. We agree.

2

We see two errors in the trial court's decision. First, the trial court incorrectly concluded that a cause of action based in subrogation required it to shift the *entire amount* of defense costs St. Paul incurred in the construction defect actions to defendants, on a joint and several basis. If that were the rule, we agree it would be unfair to burden only a small subset of the subcontractors that worked on a project with the entire cost of defending a construction defect action alleging defects in every trade. However, a cause of action based on equitable subrogation allows an insurer to step into the shoes of its insured and recover only what the insured would be entitled to recover from the defendants. (*Rossmoor Sanitation, Inc. v. Pylon, Inc*. (1975) 13 Cal.3d 622, 633-634 (*Rossmoor*) ["[a]n insurer on paying a loss is subrogated in a corresponding amount to the insured's right of action against any person responsible for the loss"].) Under the principles articulated in *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541 (*Crawford*) and the subcontracts at issue here, defendants' duty to defend the general contractor arose when the general contractor tendered its defense to them, and that duty covered the cost of defending claims related to their work. Under these circumstances, St. Paul is subrogated to the general contractor's entitlement to the *portion* of defense costs each defendant owed as a result of its duty to defend the general contractor. Because the general contractor could not recover the full amount of defense costs from any one of its subcontractors involved in the construction defect actions, neither can St. Paul.

Second, the trial court employed a flawed causation analysis when balancing the equities of this case (the seventh element of equitable subrogation). The appropriate inquiry is whether defendants' failure to defend the general contractor caused St. Paul to incur the

*defense costs*, not whether that failure caused *the underlying lawsuits*. Moreover, *Patent Scaffolding*, the case the trial court relied on for its causation analysis, is distinguishable because it involved a claim for reimbursement of property damages. Where, as here, the subrogation plaintiff seeks reimbursement of defense costs, *Interstate Fire & Casualty Ins. Co. v. Cleveland Wrecking Co.* (2010) 182 Cal.App.4th 23 (*Interstate Fire*) and *Valley Crest Landscape Development, Inc. v. Mission Pools of Escondido, Inc.* (2015) 238 Cal.App.4th 468 (*Valley Crest*) provide the applicable standard. Under that standard and the undisputed evidence presented at trial, St. Paul is entitled to reimbursement from defendants.

We will therefore reverse the judgment (including the award of attorney fees to defendants as prevailing parties under Civ. Code, § 1717) and remand to the trial court to grant judgment in St. Paul's favor and determine the amount of defense costs each defendant owes.

# I

## FACTS

A.    *The Parties, Contracts, and Developments*

Pulte Home Corporation (Pulte) was the developer, owner, and general contractor of three single-family residential developments in Murrieta (the developments). Pulte hired various subcontractors to perform work on the developments. Among those hired were defendants—Milgard Manufacturing, Inc. (Milgard), Masco Contractor Services of

4

California, Inc. (Masco), Pro Coat Systems, Inc. (Pro Coat), The Jasper Companies (Jasper), CBR Electric, Inc. (CBR), and Petersen-Dean, Inc.

Defendants entered into similar subcontracts with Pulte by which they agreed to indemnify and defend Pulte against "all liability, claims, judgments, suits, or demands for damages to persons or property arising out of, resulting from, or relating to" each defendant's scope of work.[1] Milgard's scope of work covered the provision and installation of windows and sliding glass doors; Masco's covered cabinetry; Pro Coat's, coating for garage floors and exterior decking; Jasper's, block wall fencing; CBR's, electrical work; and Petersen-Dean's, roofing components.

B.      *The Construction Defect Actions and Pulte's Tender of Defense*

In 2013 and 2014, two groups of homeowners filed lawsuits against Pulte, alleging construction defects at the developments. The allegations in the lawsuits related to nearly all aspects of the developments and covered each defendant's scope of work. Pulte tendered its defense to its subcontractors and their insurers. St. Paul, which had issued a commercial general liability policy to the subcontractor D.L. Long Landscaping (D.L. Long), accepted Pulte's tender and provided a defense in both lawsuits because Pulte

---

[1] The indemnity provision states: "Contractor hereby agrees to save, indemnify and hold harmless Pulte . . . against all liability, claims, judgments, suits, or demands for damages to persons or property arising out of, resulting from, or relating to the work performed under this Agreement or any Contractor Project Agreement ('Claims') unless such Claims have been specifically determined by the trier of fact to be the sole negligence of Pulte." The duty to defend provision states: "Contractor will defend any and all Claims, which may be brought or threatened against Pulte and will Pay on behalf of Pulte any expenses incurred by reason of such Claims including, but not limited to, Court costs and reasonable attorney fees incurred in defending or investigating such Claims or in seeking to enforce this indemnity obligation."

5

qualified as an additional insured under the policy. Another insurer also accepted Pulte's tender and provided a defense until its policy exhausted.

Pulte filed a cross-complaint against 34 of the subcontractors that worked on the developments (including defendants) for express indemnification and breach of contract. The construction defect actions were consolidated, and ultimately Pulte and several subcontractors settled with the plaintiffs for approximately $80,000. Each defendant contributed to the settlement, except for Jasper, whom the plaintiffs dismissed with prejudice shortly after the settlement. Pulte contributed $23,000 to the settlement; D.L. Long, $13,242.36; Milgard, $2,500; Petersen-Dean, $2,250; Masco, $1,250; Pro Coat, $1,000; and CBR, $500.[2]

The defense costs leading up to settlement totaled approximately $253,000, of which St. Paul paid the lion's share, about $209,000.

C.      *The Subrogation Action*

In the matter before us, St. Paul sued defendants for reimbursement of defense costs under an equitable subrogation theory, arguing it occupied the superior equitable position because, unlike defendants, it had not breached its duty to defend Pulte. St. Paul's complaint alleged defendants "failed to pay . . . their equitable share of Pulte's defense costs" and, as a consequence, St. Paul "paid in excess of its equitable share" of Pulte's defense costs. At trial, St. Paul presented evidence that Pulte had sent letters to each defendant tendering its defense in the construction defect actions "for any claims

---

[2] The main settlement occurred in March 2015. Milgard and Masco settled with plaintiffs later, in May 2016.

6

arising from the scope of work or services provided by your company." The letters cited *Crawford* and the duty-to-defend provision in defendants' subcontracts, stating "[y]our company has a contractual obligation, upon proper tender, to immediately accept and assume its active defense against claims encompassed by the indemnity provision." Pulte's counsel testified that none of the defendants responded to the tender letters or agreed to defend Pulte.

St. Paul's billing expert, Jacqueline Vinaccia, Esq., had reviewed the invoices from the construction defect actions and separated the fees into various categories. Based on her analysis, $1,650.75 of the fees billed related specifically to Milgard's work; $1,118.75 related to Masco's work; $1,467 related to Petersen-Dean's; $2,262.50 related to CBR's; $1,747 related to Pro-Coat's; and $2,182.50 related to Jasper's. She also testified that $102,291 of the total defense costs related to what she termed the "mixed" defense category. That category covered work necessarily incurred in the defense of all of the claims in the litigation (such as fees for attending mediation or status conferences) and thus could not be divided further, because it encompassed the work of every subcontractor. Finally, a claims manager at Travelers Insurance Company (which owns St. Paul) testified St. Paul had recently recovered $19,800 in settlements from other subcontractors, and this reduced the amount of defense costs St. Paul had incurred to approximately $189,000.

The trial court issued a statement of decision in favor of defendants. In denying St. Paul's claim, the court relied on *Patent Scaffolding,* an equitable subrogation case which held that a subcontractor was not entitled to reimbursement from the general contractor for damages caused by a fire at a construction site because the general contractor had not caused the fire and therefore had no "causal connection" to the damages. (*Patent Scaffolding*, *supra*, 256 Cal.App.2d at p. 514.) Analogizing to that case*,* the trial court concluded a causal connection was similarly lacking here, because defendants' failure to defend Pulte had not "caused the homeowners to file their lawsuit[s] against Pulte and thereby necessitate th[e] defense costs to be incurred." "Therefore, as in *Patent Scaffolding*, there is no causal relationship."

The trial court also concluded subrogation was an all-or-nothing claim, meaning it required a shifting of the *entire* amount of defense costs (all $189,000) to defendants on a joint and several basis and did not allow for an apportionment of costs among defendants. The court explained: "Is it fair that St. Paul should bear the entire burden of defending Pulte instead? No, but that is not the issue when equitable subrogation is sought. . . . [E]quitable subrogation is not a cost-sharing mechanism; it shifts all of the costs, not just some. The issue in such a case is whether justice requires that *the entire loss* to be shifted from [St. Paul's] shoulders and onto the shoulders of the defendant[s.] [¶] . . . [¶] Equitable subrogation being the sole basis for St. Paul's request for relief at trial, it is not entitled to recover anything from the defendants." (Italics added.)

St. Paul filed a timely appeal.

8

## II

## ANALYSIS

A.     *Standard of Review*

"Equitable subrogation is, as the name suggests, based on equity," and when a trial court exercises its equitable powers, "the appellate court reviews the judgment under the abuse of discretion standard"—that is, we ask whether the trial court's decision "exceed[s] the bounds of reason." (*Valley Crest*, *supra*, 238 Cal.App.4th at p. 482.) "In applying the abuse of discretion standard, we determine whether the trial court's factual findings are supported by substantial evidence and independently review its legal conclusions." (*Ibid.*) St. Paul argues the trial court committed legal error by misapplying the law to undisputed facts. We agree the relevant facts are not in dispute and this appeal hinges on the proper application of the relevant legal principles. Our review is therefore de novo.

B.     *Applicable Legal Principles*

1.     *Equitable subrogation*

"Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim. By undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the 'subrogee' is equitably *subrogated* to the claimant (or 'subrogor'), and succeeds to the subrogor's rights against the obligor. [Citation.] In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in

9

order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291-1292.)

A general liability insurer that has paid a claim to a third party on behalf of its insured, like St. Paul did here, may have an equitable right of subrogation against: "(1) other parties who *contributed to the harm* suffered by the third party (joint tortfeasors) under an equitable indemnification theory, and (2) other parties who are *legally liable to the insured for the harm* suffered by the third party (such as by an indemnification agreement) under a contractual indemnity theory." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 32, italics added.) This case involves the second theory. St. Paul is not seeking reimbursement for the damages paid to the plaintiff homeowners under a theory defendants' work was defective, rather it is seeking reimbursement for defense costs under a theory defendants are contractually liable for their "equitable share" of those costs.

There are eight elements of an insurer's cause of action for equitable subrogation: "[1] the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; [2] the claimed loss was one for which the insurer was *not* primarily liable; [3] the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; [4] the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; [5] the

10

insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; [6] the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; [7] justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and [8] the insurer's damages are in a liquidated sum, generally the amount paid to the insured." (*Interstate Fire*, *supra*, 182 Cal.App.4th at pp. 33-34.)

      2.     *A Subcontractor's Duty to Defend*

St. Paul's equitable subrogation claim is based on the theory that defendants breached their contractual duty to defend Pulte. In *Crawford*, the California Supreme Court analyzed a subcontractor's duty to defend a general contractor under a contract essentially identical to the one here. That agreement required the subcontractor to indemnify the general contractor "against all claims for damages . . . growing out of the execution of [the subcontractor's] work," and to "*defend any suit or action* brought against [the general contractor] *founded upon* the claim of such damage." (*Crawford*, *supra*, 44 Cal.4th at pp. 547-548.) The Supreme Court construed this contractual language to require the subcontractor to "to defend, from the outset, any suit" against the general contractor "insofar as" that suit included claims alleging damage or loss arising from the subcontractor's work on the residential project at issue. (*Id*. at p. 553.) The Court held this duty applies "even if it [is] later determined . . . [the subcontractor] was not negligent." (*Ibid.*) The Court explained that the duty to defend is distinct from, and

11

broader than, the duty to indemnify. The latter requires reimbursement, "after the fact, for defense costs" within the scope of the indemnity. (*Id.* at p. 554.) The duty to defend, in contrast, requires the subcontractor to pay for defense costs relating to its work, as the costs arise, and even if it is later determined the allegations against the subcontractor were unsuccessful or even frivolous. (*Id.* at pp. 553-554, 559.)

C.     *Analysis*

Because the trial court concluded St. Paul could not satisfy the seventh element of equitable subrogation (commonly called "balancing the equities" because it asks which party, in fairness, should bear the loss), the court did not analyze the remaining elements of the claim. We conclude the court misapplied the law applicable to the seventh element and that St. Paul has in fact demonstrated its position is equitably superior to defendants'. As a result, we analyze the other elements of equitable subrogation to determine whether St. Paul has satisfied those as well.

1.     *Element 1: Liability for the Loss*

The first element requires St. Paul to demonstrate that its insured, Pulte, suffered "a loss for which [defendants are] liable." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 33.) The loss Pulte suffered is the amount of fees it incurred in defending against claims related to defendants' work in the construction defect actions. Defendants are contractually liable for that loss under their subcontracts, which require them to defend Pulte against all "suits" or "claims" that "relate to" their work on the developments. The construction defect actions qualify as such suits because they contain allegations related

12

to defendants' work. (See *Crawford*, *supra*, 44 Cal.4th at pp. 553-554, 559 [the duty arises immediately upon tender if the lawsuit contains claims or allegations relating to the subcontractor's work].)

Defendants argue St. Paul cannot satisfy this element because the "loss" at issue is the *entire* cost of defending Pulte in the construction defect actions, and they are contractually liable only for the defense costs related to *their work*. The trial court reached the same conclusion, interpreting subrogation as a cause of action that shifts all of the defense costs, not just some. The court did not cite authority for this interpretation, and we are aware of none. Rather, the court's conclusion appears to have stemmed from its interpretation of the seventh element of equitable subrogation, which asks whether "justice requires that the loss be *entirely* shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer." (*Interstate Fire*, *supra*, 182 Cal.App.4th at pp. 33-34, italic added.) But the word "entirely" in that context refers not to the total amount the plaintiff (or subrogee) paid, but refers instead to "the claimed loss" (in the second element) that the subrogee is seeking from the defendant on the ground the defendant is primarily liable (third element) for that loss. (*Id.* [the second element of subrogation requires subrogee to prove "the claimed loss was one for which the insurer was *not* primarily liable" and the third element requires subrogee to prove the defendant was "primarily liable" for the claimed loss].)

13

We conclude the trial court's interpretation of how subrogation operates, which defendants urge us to adopt, is incorrect. While it is true that a subrogee insurer *can* seek the entire costs of defense—for example, if the insurer is an excess insurer and is claiming the general liability insurer is primarily responsible for the entire loss—a subrogee is not *required* to do so. (See *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1089 (*Maryland Casualty*) [subrogation is proper between primary and excess insurers because they do not "share the same level of liability on the same risk as to the same insured"].) In other words, subrogation entirely shifts the claimed loss, but the claimed loss doesn't have to be the entire loss the subrogee suffered.

The right of subrogation is "purely derivative." (*Bank of New York Mellon v. Citibank, N.A.* (2017) 8 Cal.App.5th 935, 948) "[A]n insurer on paying a loss is subrogated *in a corresponding amount* to the *insured's* right of action against any person responsible for the loss." (*Valley Crest*, *supra*, 238 Cal.App.4th at p. 483, quoting *Rossmoor*, *supra*, 13 Cal.3d at pp. 633-634, italics added.) "The subrogated insurer is said to "'stand in the shoes'" of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 32.) Thus, the amount of defense costs an insurer may seek depends on what the subrogor (here, Pulte) would be entitled to. If Pulte could not recover the entire costs of defense from defendants, neither can St. Paul. (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, *supra*, 65 Cal.App.4th at p. 1292 ["an insurer

cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have"].) Here, Pulte's recovery against defendants is defined by the duty to defend in the subcontracts. That duty renders defendants responsible not for the entire cost of defending the construction defect actions, but only for the costs of defending claims related to their work. (*Crawford*, *supra*, 44 Cal.4th at pp. 547-548.)

Our conclusion finds support in *Crawford*, where the Court approved of an after-the-fact allocation of defense costs among multiple subcontractors that breached their duty to defend. During the trial in that case, the general contractor had presented evidence it had incurred $375,069 in attorney fees to defend the homeowners' claims, and that 70 percent of the homeowner settlement amount "was attributable to . . . window problems." (*Crawford*, *supra*, 44 Cal.4th at p. 549.) Concluding the two window subcontractors were together liable for that percentage of the general contractor's costs (i.e., $262,548), the trial court "apportioned th[at] amount equally between [the two window subcontrators]." (*Ibid.*) Only one of the window subcontractors appealed, and it did not contest the amount it had been apportioned, only whether it was liable for the claimed costs at all. But even though the apportionment was not at issue, our high court noted that the trial court's division of costs appeared proper. "When a party sues one or more other persons, seeking to establish a contractual right to a defense against litigation not yet concluded, these issues may, if the parties agree, be deferred until the underlying litigation is complete . . . For example, [at the summary judgment stage] the court may resolve . . . whether any of

15

the contracts at issue include a duty to defend, and, if so, whether the underlying suit or proceeding as to which a defense is sought falls within the scope of any of the parties' contractual duty to defend. If the court finds that an ongoing duty to defend is owed by one or more parties, but the affected parties, acting in good faith, then cannot agree on how such a defense should be provided or financed, the court may, in its discretion, permit the underlying litigation to proceed with counsel chosen and paid by the party to whom the duty is owed, *subject to a later determination of how damages for breach of the duty to defend should be apportioned among the breaching parties*." (*Crawford*, *supra*, 44 Cal.4th at p. 565, fn. 12, italics added.) Although *Crawford* did not involve a *subrogee's* claim for reimbursement of defense costs (instead, the claim was brought by the general contractor against the subcontractor), the case is nevertheless instructive because it involved the very type of claim St. Paul seeks to subrogate to in this case—an indemnitee's right to indemnification from its indemnitor.

Here, St. Paul's complaint alleged defendants failed to pay their "equitable share" of Pulte's defense costs, and St. Paul presented evidence at trial as to what each defendant's equitable share was. In other words, the loss in the first element is different for each defendant; it is the amount of defense costs for which each is liable under its subcontract with Pulte. This element is satisfied.[3]

---

[3] Defendants argue St. Paul is taking an inconsistent position on appeal, asserting St. Paul mainly argued in the trial court that each defendant was liable, jointly and severally, for all of its defense costs. While defendants are correct that St. Paul's primary or preferred position was to shift the entire costs of defense to them, St. Paul argued for two remedies in the alternative—that is, all of the defense costs on a joint and several

*[footnote continued on next page]*

### 2. *Elements 2 and 3: Primacy of Liability*

The second and third elements are closely related. To satisfy the second element, St. Paul must demonstrate it was not "primarily liable" for "the claimed loss," which, as just discussed, is defendants' equitable share of the defense costs. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 33.) The third element requires St. Paul to show it compensated Pulte "in whole or in part" for "the same loss" for which defendants are "primarily liable." (*Ibid.*)

*Interstate Fire* is instructive on these elements. In that case, like here, the general contractor's insurer filed an equitable subrogation action against one of the subcontractors, seeking reimbursement of defense costs (and the amount it paid in settlement) under the theory the subcontractor breached its duty to defend and indemnify the general contractor against those losses. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 28.) The court held "[a]n entity which, like [the subcontractor], agrees to indemnify *the other party* [i.e., the general contractor] *to the underlying transaction* has a liability of greater primacy than an independent insurer that insures against loss." (*Id.* at p. 44; accord *Valley Crest*, *supra*, 238 Cal.App.4th at p. 488 [the primacy of the subcontractor's liability for defense costs incurred in an action relating to a construction project was greater than that of a general liability insurer "not involved in the construction project"]; *Meyer Koulish Co. v. Cannon* (1963) 213 Cal.App.2d 419, 423, 429 [consignment shop

---

basis or an allocation of costs among the defendants. Indeed, one of the reasons it put on Ms. Vinaccia's expert testimony on billing was to provide the trial court an evidentiary basis upon which to allocate costs.

owner's liability for the value of jewelry stolen from its store was of greater primacy than the general liability insurer's liability because the consignment agreement assigned the risk of the *specific loss* that occurred to the shop owner].)

Here, St. Paul is a general liability insurer uninvolved in the underlying residential developments. Its commercial general liability policy with D.L. Long obligated it to "pay amounts any protected person is legally required to pay as damages for covered . . . property damage," which is defined as "physical damage to tangible property of others, including all resulting loss of use of that property; or loss of use of tangible property of others that isn't physically damaged." The policy also obligated St. Paul to "defend any protected person against a claim or suit for . . . damage covered by this agreement." It is undisputed Pulte qualified as a "protected person" or additional insured under the policy. Defendants, in contrast, were directly involved in the developments and entered agreements obligating them to defend Pulte in any lawsuits related to their work. Defendants are therefore primarily liable for the claimed loss—that is, their equitable share of the defense costs.

Defendants' reliance on *Maryland Casualty* is misplaced. That case stands for the proposition that subrogation is not proper between two *insurance companies* that "share the same level of liability on the same risk as to the same insured." (*Maryland Casualty*, *supra*, 81 Cal.App.4th at p. 1089.) In such cases, contribution, not subrogation, is the appropriate cause of action, because the insurance companies are co-obligors and neither has a more primary liability for the insured loss. (*Ibid.*) This legal principle has no

18

bearing on a case like this, where an insurance company seeks subrogation not from another insurance company but from a subcontractor that had agreed to defend the insured in the underlying transaction.**4**

   3. *Elements 4, 5, 6, and 8*

Defendants correctly concede St. Paul has satisfied the fourth, fifth, sixth, and eighth elements. The fourth element has been satisfied because Pulte qualified as a "protected person" under St. Paul's policy with D.L. Long, which means St. Paul paid for Pulte's defense costs to protect its own interest, not as a volunteer. (*State Farm & Casualty Co. v. Cooperative of American Physicians, Inc.* (1984) 163 Cal.App.3d 199, 203 [insurance carrier that provides a defense in response to a tender from its insured is not a volunteer].) The fifth element "asks whether [Pulte] would have an assignable cause of action against [defendants] 'had it not been compensated for its loss' by [St. Paul]." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 36.) This element is met because Pulte

---

**4** In the tentative decision it issued before its statement of decision, the trial court reasoned that St. Paul had overreached by seeking subrogation (which it erroneously believed required a shift of all the defense costs) instead of contribution. The court noted, "[a] fair distribution of [defense costs] would be one in which liability is shared, as it would be were St. Paul to seek contribution." As St. Paul correctly notes on appeal, it has no right of contribution against defendants. Contribution is available only between obligors who share the same level of liability. Thus, had St. Paul sued defendants' insurance companies, contribution would be the appropriate cause of action. Alternatively, if St. Paul were not an insurance company but one of the subcontractors hired by Pulte to work on the developments, it could have sued defendants for contribution. (*Aerojet-General Corp. v. Transport Indem. Co.* (1997) 17 Cal.4th 38, 72 [holding that "[e]quitable contribution applies only *between* insurers"]); 13 Witkin, Summary of Cal. Law (11th ed. 2017) Equity, § 201(b), p. 541 [equitable contribution is available where "multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss"].)

19

could have sought defense costs from defendants under the subcontracts had St. Paul not paid those costs on Pulte's behalf. The sixth element—that St. Paul has suffered damages as a result of defendants' breach of their duty to defend—is easily met. Had defendants made the payments, St. Paul would not have had to make them. (*Ibid.*)

And finally, St. Paul has satisfied the eighth element by proving damages in a liquidated sum. At trial it presented evidence that it spent $102,291 on a general or "mixed" defense of the lawsuits, which relates to the work of all subcontractors and is therefore indivisible. St. Paul also presented evidence it spent smaller, specific sums on each defendant's defense (i.e., $1,650.75 on Milgard, $1,118.75 on Masco, $1,467 on Petersen-Dean, $2,262.50 on CBR, $1,747 on Pro-Coat, and $2,182.50 on Jasper).

4. *Element 7: Balancing the Equities*

The seventh element asks whether justice requires that the claimed loss "be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer." (*Interstate Fire*, *supra*, 182 Cal.App.4th at pp. 33-34.) As courts have observed, "'there is no facile formula for determining superiority of equities, for there is no formula by which to determine the existence or nonexistence of an equity except to the extent that certain familiar fact combinations have been repeatedly adjudged to create an equity in the surety or the third party.'" (E.g., *State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098, 1112, quoting *Hartford Acci. & Indem. Co. v. Bank of America* (1963) 220 Cal.App.2d 545, 558.)

20

St. Paul contends *Interstate Fire* and *Valley Crest* articulate the relevant test under these circumstances because they involve the same fact pattern as this case. That is, those cases involve a general liability insurer's claim for reimbursement of defense costs paid on behalf of the general contractor from subcontractors that owed and breached a duty to defend the general contractor. We agree those cases provide the test applicable to these facts.

*Interstate Fire* involves an insurance company's subrogation complaint against a subcontractor, at the demurrer stage. The insurer's complaint alleged that the general contractor had hired a subcontractor (subcontractor 1) to work on a construction project. Their agreement obligated subcontractor 1 to defend and indemnify the general contractor against claims related to subcontractor 1's work. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 28.) While working on the project, the employee of a different subcontractor (subcontractor 2) suffered serious injuries allegedly caused, at least in part, by subcontractor 1's work. (*Id.* at p. 29.) The employee sued the general contractor and subcontractor 1 for negligence, and the general contractor tendered its defense to subcontractor 1 under the express indemnification provision of their agreement. Subcontractor 1 rejected the tender. Subcontractor 2's insurance company accepted the tender because the general contractor was an additional insured under its policy with subcontractor 2. After spending $152,000 in attorney fees and costs to defend the personal injury lawsuit and $575,000 to settle it, the insurance company sought reimbursement for both the defense and settlement costs from subcontractor 1 under an

21

equitable subrogation theory. The appellate court reversed the trial court's order sustaining subcontractor 1's demurrer, concluding that the pleaded facts, if true, entitled the insurer to subrogation.

In *Valley Crest*, a general contractor had hired a subcontractor to build a pool at a hotel. (*Valley Crest*, *supra*, 238 Cal.App.4th at pp. 473-474.) Their agreement required the subcontractor to defend and indemnify the general contractor against any claims arising from the subcontractor's work. (*Id.* at p. 489.) A hotel guest who was seriously injured after diving into the shallow end of the pool sued the hotel, its design consultant, the general contractor, and the subcontractor for negligence. (*Id.* at p. 475.) The subcontractor never responded to the general contractor's tender, and the general contractor's insurance company covered the defense. During the litigation, the trial court granted summary judgment in favor of the subcontractor, finding its work was not a cause of the plaintiff's injury. The lawsuit ultimately settled, and, as in *Interstate Fire*, the insurance company that had defended the general contractor sued the subcontractor for both defense and settlement costs under an equitable subrogation theory. After a bench trial, the court concluded the insurance company was entitled to subrogation and the subcontractor had forfeited its right to seek allocation of the claimed defense and settlement costs by failing to accept the general contractor's tender of defense. (*Valley Crest*, at p. 477.) The appellate court upheld the trial court's ruling. (*Id.* at p. 491.)

In balancing the equities and determining which party, in fairness, should bear the claimed loss—the insurer or the subcontractor—*Interstate Fire* and *Valley Crest* considered four factors. We take each in turn.

### a. Cause of the loss

The first factor asks, as between the parties to the subrogation action, which has the greater causal connection to the loss. In both *Interstate Fire* and *Valley Crest*, the courts concluded the subcontractors had a greater causal connection to the loss because they were at least *alleged* to have been negligent in the underlying actions in which the defense and settlement costs were incurred, whereas the insurance companies were not alleged to have done anything wrong. (*Interstate Fire*, *supra*, 182 Cal.App.4th at pp. 40-41; *Valley Crest*, *supra*, 238 Cal.App.4th at pp. 487-488.)

In *Interstate Fire*, the court reasoned that allegations of negligence in the underlying lawsuit, whether ultimately proven or not, are nevertheless "relevant to the [parties'] respective equities." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 39.) The court concluded the allegations in the underlying lawsuit that the subcontractor had been negligent "tip[ped]" the equities in the insurer's favor because those allegations were what "precipitated the lawsuit . . . [and] made it necessary for [the general contractor] to incur the costs of defense and settlement." (*Id.* at p. 40.)

In *Valley Crest*, the court noted that the insurer "did not cause the loss or have anything to do with causing [the plaintiff's] injuries," whereas the subcontractor "was alleged to have contributed to causing [the] injuries." (*Valley Crest*, *supra*, 238

23

Cal.App.4th at p. 487.) However, the court ultimately concluded this factor did not tip the scales of equity much in the insurer's favor because the allegations of the subcontractor's negligence were defeated during summary judgment in the underlying litigation. (*Id.* at p. 488.)

Applying these principles here, we conclude the equities tip slightly in St. Paul's favor because it had nothing to do with causing the plaintiff homeowners' property damage, whereas defendants' work was at least alleged to have contributed to the damage—and those allegations are what precipitated the defense costs. While it is true there was no determination of fault in the underlying construction defect actions because the cases settled, that fact is not relevant here because St. Paul is not seeking settlement costs like the insurers in *Interstate Fire* and *Valley Crest*.

In its statement of decision, the trial court concluded St. Paul's reliance on *Interstate Fire* was misplaced because that case took place at the demurrer stage, which concerns the sufficiency of the pleading only, not proof of necessary facts. The trial court stated: "Here, by contrast, we are long past the time for challenges to the pleadings . . . . In the instant case, . . . there was no persuasive evidence at trial (if any evidence at all) that the defendants' work had been negligently performed."[5] In so reasoning, the trial court conflated the allegations in the insurer's subrogation complaint with the allegations

---

[5] The reason St. Paul presented no evidence that defendants negligently performed their work on the developments at issue in the construction defect actions is because, before trial, the court granted St. Paul's motion to exclude such evidence. The trial court correctly concluded such evidence was irrelevant because, under *Crawford*, the duty to defend is triggered by allegations relating to a subcontractor's work and does not depend on an ultimate finding of fault.

in the prior or underlying personal injury lawsuit. In *Interstate Fire*, the insurer's subrogation complaint alleged that the personal injury complaint had alleged the subcontractor's negligence caused the injury. The court concluded that if the insurer could prove that allegation (that is, the allegation about what the underlying personal injury complaint had alleged), then that fact would tip the equities in the insurer's favor. Here, St. Paul *did* prove that the construction defect actions alleged defendants' work was defective, by submitting the two complaints into evidence. As a result, the trial court incorrectly concluded *Interstate Fire* was inapplicable to this case.

### b. *Nature and scope of contractual promises*

This factor compares the nature and scope of the relevant contractual promises (here, the duty to defend), and as such, is similar to the second and third elements, which ask which party had the contractual liability of greater primacy. When analyzing this factor, the *Interstate Fire* court concluded the equities tipped in favor of the insurer because the subcontractor agreed to indemnify the general contractor against the *specific* loss incurred, whereas the insurer agreed to cover a broad category of losses, which happened to include the loss at issue. "An entity which, like [the subcontractor], agrees to indemnify *the other party to the underlying transaction* has a liability of greater primacy than an independent insurer that insures against loss. [Citations.] The parties directly involved in the transaction are better able to evaluate and control the risk. Therefore, for purposes of weighing the equities in an equitable subrogation case, . . . the Agreement between the parties who were connected to the incident giving rise to the loss . . . creates

25

the greater equitable responsibility for indemnification, as compared to that of the general liability insurer . . . ." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 44.) Similarly here, defendants agreed to defend Pulte, the other party to the underlying residential developments, specifically against claims alleging defects in their work, whereas St. Paul was a general liability insurer and its policy with D.L. Long did not relate specifically to the residential developments. For purposes of comparing equities, this creates a liability of greater primacy for defendants.

### c.   *Receipt of premiums*

In other subrogation contexts, courts have concluded that an insurer's receipt of premiums to insure the risk of loss would result in an unfair windfall to the insurance company if subrogation were permitted. (E.g., *Patent Scaffolding*, *supra*, 256 Cal.App.2d at p. 516.) However, in the same factual setting as the one here, the *Interstate Fire* and *Valley Crest* courts found the insurer's receipt of premiums was a neutral factor in the comparison of equities, because the subcontractor defendants were also "compensated for undertaking the risk of loss" by accepting consideration for the performance of their obligations under their subcontracts. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 45; *Valley Crest*, *supra*, 238 Cal.App.4th at p. 488.) The same reasoning applies here, making this a neutral factor in our analysis.

### d.     *Public policy*

Up to this point, the equities have tipped only slightly in St. Paul's favor, but that changes with the final factor, which asks whether public policy should play a role in the

fairness analysis. In both *Interstate Fire* and *Valley Crest*, the courts concluded public policy counseled in favor of granting the insurers' claims, as denying subrogation would incentivize subcontractors to breach their agreements with general contractors. The courts explained: "'In our view, it is not a good idea to reward parties who refuse to fulfill their alleged indemnification obligations, particularly under the rubric that they are in as good or better an *equitable* position as the insurer that did fulfill its alleged indemnification obligation. We believe it is more prudent to permit subrogation, so that a party with an alleged contractual indemnification obligation will be encouraged to step up in the underlying case and either fulfill the obligation (and implicitly help settle the case) or resolve any dispute over the application of the indemnification obligation. If permitting subrogation to the insurer in any way results in a windfall (because the insurer that accepted premiums to insure against the loss may now shift the loss to the other indemnitor), it would be better for the windfall to go to the one that undisputedly fulfilled its contractual obligations, rather than to the one that allegedly breached them." (*Valley Crest*, *supra*, 189 Cal.App.4th at p. 487, quoting *Interstate Fire*, *supra*, 182 Cal.App.4th at p. 47.)

Both courts noted that the subcontractors, which had allegedly contributed to the losses, had not fulfilled their contractual obligations to their general contractors, while the insurers, which had nothing to do with the incidents leading to the losses, abided by their contractual obligation to pay for them. (*Valley Crest*, *supra*, 189 Cal.App.4th at p. 487.) "The comparison, therefore, is between one party who had nothing to do with causing the

27

loss but abided by its contractual obligation to pay for it, and another party who caused the loss and then shunned its contractual obligation to pay it." (*Ibid.*) The same reasoning applies here. St. Paul fulfilled its contractual duty to pay Pulte's defense costs, while defendants did not. We agree with *Interstate Fire* and *Valley Crest* that the better public policy is to reward the party that fulfilled its contractual responsibilities, rather than incentivize future breaches of the duty to defend.

### 5. *The Trial Court's Reliance on* Patent Scaffolding

The trial court's conclusion that the equities did not tip in St. Paul's favor was based on two grounds—its determination that subrogation requires a shift of all of the defense costs to defendants (which, as we explained above, was incorrect) and its misapplication of *Patent Scaffolding*. We now explain the second legal error in the trial court's decision.

In *Patent Scaffolding*, a general contractor had hired a subcontractor to perform work on a building. (*Patent Scaffolding*, *supra*, 256 Cal.App.2d at p. 508.) Their contract required the general contractor to obtain fire insurance on the subcontractor's property at the jobsite, but the general contractor failed to do so. (*Ibid.*) After a fire of unknown origin destroyed some of the subcontractor's property, the subcontractor's fire insurers paid the subcontractor for the loss. The insurers then sought to subrogate to the subcontractor's rights against the general contractor for indemnification of the property damage amount, on the theory the general contractor had breached its promise to obtain fire insurance. (*Ibid.*) The trial court permitted subrogation on the ground the general

28

contractor had agreed to obtain fire insurance and thereby impliedly agreed to indemnify the subcontractor against the loss (despite the absence of an express indemnification provision in the contract). (*Id.* at pp. 508-509.)

The appellate court reversed, holding the insurers were not entitled to subrogation because the general contractor's failure to obtain fire insurance had not caused the fire. (*Patent Scaffolding*, *supra*, 256 Cal.App.2d at p. 512.) "The insurers' loss was not caused by [the general contractor]'s failure to get insurance or to indemnify [the subcontractor]. The insurers' loss was caused by the fire, the very risk which each assumed, and [the general contractor]'s failure to perform its contractual duty had nothing to do with the fire." (*Ibid.*) The court held that when "two parties are contractually bound by independent contracts to indemnify the same person for the same loss, the payment by one of them to his indemnitee does not create in him equities superior to the nonpaying indemnitor, justifying subrogation, if the latter did not cause or participate in causing the loss." (*Id.* at p. 514.) It added that if subrogation were permitted, "the insurers who have accepted premiums to cover the very loss which occurred [would] receive a windfall." (*Id.* at p. 516.)

Analogizing to *Patent Scaffolding*, the trial court stated: "Applying [*Patent Scaffolding's*] analysis here, the relevant facts are these: the wrongdoers are the defendants; their wrongful conduct consists of their breaches of their contractual obligations to defend Pulte . . . and the loss to Pulte was the expense of defending against that suit. The question presented by the instant case, therefore, *is whether the defendants'*

29

*breaches of contract caused the homeowners to file their lawsuit against Pulte* and thereby necessitate those defense costs to be incurred. Obviously, the answer is, 'No.' Therefore, as in *Patent Scaffolding*, there is no causal relationship." (Italics added.)

The trial court's analysis was correct up until the italicized language, which asks the wrong causation question. Rather than ask whether defendants' failure to accept Pulte's tender caused Pulte (and later St. Paul) to incur those costs, the trial court instead asked whether defendants' failure to accept Pulte's tender caused the construction defect actions themselves. Under such a causation analysis, a subcontractor's breach of its duty to defend could never have a causal connection to defense costs. This is because its duty to defend does not arise until *after* the general contractor is sued and tenders its defense. Such an analysis would have the undesirable result of cloaking subcontractors with impunity for breaching their contractual duties. The proper inquiry is whether defendants' breach caused Pulte to incur the loss St. Paul is claiming in this litigation (i.e., defendants' share of the defense costs). The answer to that question is yes.

But even if the court had not misapplied *Patent Scaffolding's* causation analysis, the facts of the case are so distinguishable as to render it of little value to our analysis. As the *Valley Crest* court observed, "[a]ge and subsequent appellate court opinions have not been kind to *Patent Scaffolding.*" (*Valley Crest*, *supra*, 238 Cal.App.4th at p. 491.) Two years after it was decided, a different Court of Appeal cautioned that "[t]he holding in the *Patent Scaffolding* case does not constitute a rule applicable to every situation in which an insurer of an indemnitee seeks to hold the contractor-indemnitor on an indemnity

30

contract." (*Pylon, Inc. v. Olympic Ins. Co.* (1969) 271 Cal.App.2d 643, 651.) Another Court of Appeal criticized *Patent Scaffolding* as precluding subrogation in any case in which the defendant/indemnitor's negligence is not the cause of the insured's loss, "a result inconsistent with the rule articulated in *Patent Scaffolding* itself and the cases on which it relies," cases which acknowledge that subrogation can be based on a tortfeasor theory *or* a contractual liability theory. (*Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553, 557.) The *Interstate Fire* court disagreed with *Patent Scaffolding* for rewarding the party that refused to fulfill its indemnification obligations. The court concluded the better policy is to permit subrogation for an insurer that fulfilled its contractual obligations, even if the result is a windfall for the insurer. (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 47.) Based on these criticisms, the *Valley Crest* court decided not to follow *Patent Scaffolding*. (*Valley Crest*, at p. 491 ["[t]o whatever extent *Patent Scaffolding* might be relevant here, we decline to follow it"].)

Whether or not *Patent Scaffolding* was correctly decided, we agree with the *Interstate Fire* court that the case is "plainly distinguishable" on its facts. This is because it did not involve a situation (like ours and those in *Interstate Fire* and *Valley Crest*) where the defendant "*was* alleged to have caused the loss" and had "expressly promised to indemnify (not just to obtain insurance) in a contract related to the project from which the underlying loss occurred." (*Interstate Fire*, *supra*, 182 Cal.App.4th at p. 38.) Put differently, the loss in *Patent Scaffolding* was property damage for which the general contractor had not expressly agreed to indemnify the subcontractor. Here, in contrast, the

31

loss is the defense costs defendants expressly agreed to bear under their subcontracts with Pulte.

### 6. *Defendants' Equitable Portion of Defense Costs*

St. Paul argues there is no need to remand this case to the trial court to determine the amount for which each defendant is liable. St. Paul argues we can determine those amounts on appeal based on the trial record because it presented evidence of how much it spent on (a) defending the case in general (i.e., the "mixed" defense costs) and (b) defending each defendant in particular. Defendants respond that if we conclude (as we have) that St. Paul is entitled to subrogation, we should remand to the trial court to determine the amount of defense costs to shift to each defendant. Pro Coat, Jasper, and CBR argue that they and their codefendants are entitled to a jury trial on the issue because St. Paul is seeking monetary damages from defendants, which is a legal, not equitable, remedy.

As an initial matter, defendants are not entitled to a jury trial on the amount each owes St. Paul in subrogation. "The right to a jury trial is guaranteed by our Constitution." [Citation.] 'The right to trial by jury guaranteed by the Constitution is the right as it existed at common law at the time the Constitution was adopted. [Citation.]'" (*Jogani v. Superior Court* (2008) 165 Cal.App.4th 901, 905.) "It is well settled in California that there is no right to a jury trial in civil actions that are equitable in nature. It is only when issues of law are involved that the right to a trial by jury attaches." (*Meyer Koulish Co. v. Cannon*, *supra*, 213 Cal.App.2d at pp. 430-431.)

32

"[E]quitable subrogation. . . . [is] a proceeding in equity [and] the matter would ordinarily be determined by the court." (*St. Paul Fire & Marine Ins. Co. v. Murray Plumbing & Heating Corp.* (1976) 65 Cal.App.3d 66, 72.) "'"'Subrogation is equity's second method of compelling the ultimate payment by one who in justice and good conscience *ought to* make it—of putting the charge where it justly belongs. [Citation.] It is not an absolute right, but depends upon the superiority of the equities of him who asserts it over those of the one against whom it is sought.' . . .'" [Citation.]" (*Fireman's Fund Ins. Co. v. Morse Signal Devices* (1984) 151 Cal.App.3d 681, 686.) We conclude the trial court correctly denied defendants' request for a jury trial at the outset of this case, and our decision that St. Paul is entitled to subrogation does not alter the analysis. Contrary to Pro Coat's assertion, it does not matter that St. Paul is seeking monetary damages and not a traditionally equitable remedy like declaratory relief. If, as here, "the action is essentially one in equity and the relief sought depends upon the application of equitable doctrines, the parties are not entitled to a jury trial." (*American Motorists Ins. Co. v. Superior Court* (1998) 68 Cal.App.4th 864, 871.)

Turning to the issue of which court should decide what portion of the defense costs each defendant should pay, we conclude the more prudent course is to remand to the trial court to exercise its discretion in the first instance. If St. Paul were seeking only the defense costs specifically related to each individual defendant—that is, if it were seeking only $1,650.75 from Milgard, $1,118.75 from Masco, $1,467 from Petersen-Dean, $2,262.50 from CBR, $1,747 from Pro-Coat, and $2,182.50 from Jasper—there

33

would be no need to remand to the trial court because no discretion would be involved. The judgment would simply depend on the application of the law to undisputed evidence. But that is not all St. Paul wants from this litigation. It also seeks reimbursement for the $102,291 it spent on the general defense of the case, fees that were not related to any one specific subcontractor's work that any party defending the action would have incurred. While we conclude such costs fall within defendants' contractual duty to defend Pulte against any "suits . . . related to" their work, the equitable division of those costs among defendants should fall to the trial court. (See *Maryland Casualty*, *supra*, 81 Cal.App.4th at p. 1094 [appellate court refusing to allocate defense costs between parties because "[t]he proper allocation of costs is within a trial court's broad discretion" and "[t]he trial court did not have the opportunity to exercise this discretion"].)

### 7. *Attorney Fees*

The trial court's postjudgment award of attorney fees to each defendant was based on its conclusion St. Paul was not entitled to subrogation and, as a result, defendants were "prevailing parties" under Civil Code section 1717. Because we are reversing that determination, defendants are no longer prevailing parties, and the fee awards cannot stand. (E.g., *Gillian v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1053 ["reversal of the judgment necessarily compels the reversal of the award of fees as costs to the prevailing party based on the judgment"].)

## III

## DISPOSITION

We reverse the judgment and the postjudgment orders awarding fees and costs to defendants. On remand, the trial court shall enter judgment in St. Paul's favor and determine the amount of defense costs to shift to each defendant. St. Paul is entitled to costs on appeal.

CERTIFIED FOR PUBLICATION

SLOUGH
J.

We concur:

MILLER
Acting P. J.

MENETREZ
J.